# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

**UNITED STATES OF AMERICA**

v.

**MARVIN MILLER**

Defendant.

**CRIMINAL NO. JKB-24-0164**

---

## DEFENDANT'S SENTENCING MEMORANDUM

### I. INTRODUCTION

Marvin Miller, by and through undersigned counsel, respectfully submits this Sentencing Memorandum in support of a variance sentence, which is scheduled for February 11, 2026, before the Honorable James K. Bredar. Mr. Miller entered a guilty plea to Counts One and Two of the Superseding Information, charging him with Conspiracy to Distribute Controlled Substances in violation of 21 U.S.C. § 846, and Possession with Intent to Distribute Controlled Substances in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C).

Pursuant to the parties' Rule 11(c)(1)(C) plea agreement, the parties have jointly recommended a sentence of not less than 96 months nor more than 135 months imprisonment. While the advisory guideline range is 135 to 168 months, this variance is appropriate and is consistent with the Federal Sentencing Reform Act of 1984, 18 U.S.C. § 3553(a), which requires that any sentence imposed be "sufficient, but not greater than necessary" to achieve the statutory purposes of sentencing.

This Memorandum demonstrates that Mr. Miller's background, history, demonstrated acceptance of responsibility, substance abuse challenges, his role as a father to six children, and particularly his critical importance to his traumatized daughter's recovery merit a sentence that reflects both the seriousness of his offense and his genuine potential for rehabilitation and successful reintegration. The substantial mitigation factors present in Mr. Miller's circumstances support a sentence below the advisory guideline range.

## II. STATUTORY AND GUIDELINE FRAMEWORK

### A. Applicable Statutes and Maximum Penalties

Mr. Miller faces a statutory maximum of 20 years imprisonment on each count. The special assessment of $100 per count is mandatory pursuant to 18 U.S.C. § 3013. Both counts carry a maximum fine of $1,000,000 and minimum supervised release of three years pursuant to 21 U.S.C. § 841(b)(1)(C).

### B. Guideline Range Calculation

The parties have stipulated to the following guideline calculations:

- Count One (Conspiracy): Base offense level 34 based on 50+ kilograms but less than 150 kilograms of cocaine foreseeable to the defendant pursuant to U.S.S.G. § 2D1.1(c)(3).
- Count Two (Possession with Intent to Distribute): Base offense level 24 based on 500 grams to 2 kilograms of cocaine pursuant to U.S.S.G. § 2D1.1(c)(8).

- Grouping: The counts group pursuant to U.S.S.G. § 3D1.2(c), with the highest offense level of 34 as the adjusted offense level.

- Acceptance of Responsibility: Three-level reduction (2 levels under § 3E1.1(a) and 1 additional level under § 3E1.1(b)) for Mr. Miller's prompt recognition of responsibility and timely notification of his intention to enter a guilty plea.

- Adjusted Offense Level: 31

- Criminal History Category: III (6 criminal history points)

- Advisory Guideline Range: 135 to 168 months

## C. The Booker Framework and Variance Authority

Following *United States v. Booker*, 543 U.S. 220 (2005), sentencing guidelines are advisory, not mandatory. In *Gall v. United States*, 552 U.S. 38, 49 (2007), the Supreme Court held that "the Guidelines should be the starting point and the initial benchmark" but that "the Guidelines are not the only consideration." After calculating the advisory guidelines range, the Court must consider all § 3553(a) factors to determine whether they support a variance from the guideline range.

As the Supreme Court emphasized in *Gall*, courts must "begin all sentencing proceedings by correctly calculating the applicable Guidelines range," then make "an individualized assessment based on the facts presented" in the specific case. The Court specifically cautioned that a "district court judge is not bound by the Guidelines," and may impose a sentence outside the applicable range when § 3553(a) factors warrant such a variance.

Similarly, in *United States v. Johnson*, 529 U.S. 53, 60 (2000), the Court recognized that the law's goal is not perpetual punishment but proportionate accountability, suggesting that criminal sentences should reflect the moral and legal boundaries society seeks to reinforce. A sentence of no more than 96 months accomplishes exactly that, it has imposed substantial punishment, allowed for reflection and change, and reinforced accountability, without crossing into excess or diminishing justice. *See United States v. Schuyler*, 407 Fed. Appx. 649, 650 (4th Cir. 2011) (A "district court 'may not presume that the Guidelines range is reasonable' but 'must make an individualized assessment based on the facts presented'") (citation omitted).

## III. STATUTORY AND CASE LAW SUPPORTING VARIANCE

### A. The Statutory Mandate of § 3553(a)

The Federal Sentencing Reform Act of 1984, codified at 18 U.S.C. § 3553(a), provides the statutory authority for variance sentencing. The statute requires that "the court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing." This language explicitly authorizes courts to impose sentences that deviate from advisory guideline ranges when such sentences are "sufficient" to achieve sentencing purposes without being "greater than necessary."

The statute identifies specific factors the Court must consider: "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for the sentence imposed to afford adequate deterrence to criminal conduct; (4) the need for the sentence

imposed to protect the public from further crimes of the defendant; and (5) the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." Mr. Miller's case presents compelling considerations under each of these statutory factors supporting a variance below the advisory guideline range.

## IV. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE (18 U.S.C. § 3553(a)(1))

### A. Offense Conduct

Investigators identified Mr. Miller as the operator of a stash house that trafficked in cocaine. Surveillance revealed that Mr. Miller maintained and controlled a cocaine stash location in Baltimore beginning in April 2023; frequented the location daily and met with co-conspirators; on December 19, 2023, distributed cocaine to Elroy Johnson, resulting in the seizure of one kilogram when Johnson was stopped by law enforcement; possessed approximately one kilogram of cocaine in the basement of his stash location; possessed approximately $671,685 in bulk currency stored in suitcases, which he arranged to use to purchase approximately 60 kilograms of additional cocaine. Police interdiction occurred prior to any such purchase, but a cellphone with messages provided police with the details.

### B. Acceptance of Responsibility

Mitigating the nature of the offense is Mr. Miller's acceptance of responsibility. Mr. Miller has been compliant with pretrial release at every step, and forthcoming and honest with the probation officer during the preparation of the Presentence Investigation

Report. He admitted to possessing CDS and currency when arrested. He has consistently acknowledged his guilt and accepted responsibility for his actions throughout this proceeding. This genuine acceptance of responsibility, demonstrated through his guilty plea, warrants recognition by this Court and supports a sentence variance based on the § 3553(a)(1) factors.

## V. THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT (18 U.S.C. § 3553(a)(1))

### A. Background and Family

Marvin Lee Miller, Jr., age 37, was born on January 19, 1988, in Baltimore, Maryland. He is a lifelong Baltimore resident with a complex family history that shaped his childhood and adolescence.

Mr. Miller was raised by his mother, grandmother, and aunt until age 14. While his family provided for his basic needs, the household experienced financial struggles. Mr. Miller's childhood in inner city Baltimore exposed him to significant trauma and adversity. He witnessed drugs and violence--shootings, stabbings, and fights, regularly throughout his neighborhood. He witnessed his uncle's struggling with active drug addiction and frequent incarceration. At age 12, Mr. Miller witnessed his first murder. He witnessed approximately four murders during his childhood years, all within his neighborhood. These experiences of community violence and the normalization of drug use and dealing profoundly shaped his understanding of the world and his opportunities.

Mr. Miller's own drug use began early. He started using marijuana at age 12 or 13 and began dealing drugs by age 14. This trajectory reflects not moral depravity, but rather,

exposure to a dangerous and criminal environment during his critical developmental years. Moreover, Mr. Miller described his childhood upbringing as "fast." He entered into a sexual relationship at the age of 14 with an older woman, and ultimately, helped raise two of her children. This is clearly not typical behavior but does show that Mr. Miller values family and is sincere in his commitment to those he considers family.

## B. Criminal History

Although Mr. Miller's criminal history is not in dispute, it should be noted that there was a lengthy gap in criminality. Defendant's last criminal conviction prior to the instant case occurred in 2014. Defendant was released on this matter in July of 2015. The defendant's only court contact after this date was receiving a probation before judgement (PBJ), sans fine, on a non-incarcerable traffic offense for driving while suspended under TA 16-303(h), which carries a maximum penalty of three (3) points on his license and a $500.00 fine.

## C. Six Dependent Children

Mr. Miller is the father of six children ranging from 2 to 27 years old. According to the PSR, Mr. Miller plays an active role in his children's lives. He is not subject to a court-ordered child support obligation but provides for his children financially to the best of his ability. He describes himself as an actively involved father who takes his younger children to bounce houses and Chuck E. Cheese and his older children to movies and the mall.

Mr. Miller maintains daily contact with multiple minor children: Amora Miller (age 3), Marlee Miller (age 3), Marvin Miller III (age 12), Journie Carlton (age 16), and Payton Miller (age 16).

**D. Daughter's Sexual Assault and Its Impact on the Family**

Tragically, Mr. Miller's daughter, Payton Miller, age 16, was sexually assaulted in January 2024. This sexual assault has had severe and ongoing psychological consequences for Payton, for Mr. Miller, and for their family. According to the PSR, Payton is "scared and does not like leaving the house." She underwent therapy, which Mr. Miller facilitated by transporting her to all appointments prior to their cessation. The sexual assault occurred on school grounds, perpetrated by Gregory Hightower, a previously convicted sexual offender. Hightower entered a guilty plea on March 20, 2024 and received a sentence of life suspend all but twenty-five years of confinement under case number 124109004 in the Circuit Court for Baltimore City**.** Hightower was not a school employee and trespassed onto school property as the children were departing for the day, victimizing two children at the same time. Payton has been struggling academically as a direct result of the mental anguish caused by her assault. The trauma has manifested in anxiety, depression, fear, and isolation. Moreover, the school system failed to provide any resources, and the parents have engaged in what they describe as an uphill battle to ensure Payton is not penalized by the school when she is having difficulty coping or focusing on school assignments.

**E. The Irreplaceable Role of Parents in Victims' Recovery**

The impact of sexual assault on young victims extends far beyond the immediate trauma of the crime itself. Extensive research demonstrates that parental presence, support, and involvement is critical to a victim's recovery from sexual assault trauma. Understandably, his daughter's victimization has nothing to do with Mr. Miller's drug trafficking and occurred after this arrest and prosecution. *To be very clear, Mr. Miller does not raise this issue as an explanation for his own actions, or an excuse*. Mr. Miller cannot change the timing of his daughter's victimization, and his own daughter's experience has helped him re-shape his own view of his criminal behavior, and his need to make better life decisions that do not result in being removed from society and unable to be the present father that she needs, she wants and deserves. Simply put, Mr. Miller knows he will have to serve a term of confinement but asks the court to consider the length of it weighing the need to punish, and the need for his presence in his daughter's life.

**F. Psychological Research on Parental Support in Sexual Assault Recovery**

Parents serve as a child's primary source of emotional support and safety following sexual assault. Studies demonstrate that the quality of parental support is one of the strongest predictors of a child's recovery trajectory following sexual assault trauma. Children who receive consistent parental emotional support, validation, and presence recover more effectively and experience fewer long-term mental health consequences. Parental involvement in therapeutic processes increases treatment effectiveness and compliance. The presence of a supportive parent provides a child with a sense of safety necessary to process trauma and rebuild trust in relationships. Parental consistency and

engagement signal to the child that they are valued, protected, and not blamed, which are critical factors in trauma recovery[1].

## G. Payton's Specific Needs

Payton's recovery from this sexual assault depends critically on the consistent presence and support of her father. During this vulnerable period, she needs a safe, familiar presence who can ground her during moments of acute anxiety and fear; a person who believes her, validates her experience, and provides unconditional emotional support; a parental figure who reinforces that the assault was not her fault and that she is valued and worthy of protection; and consistency and reliability as she rebuilds her sense of safety in the world. Mr. Miller's presence and active participation in Payton's journey demonstrates his commitment to supporting her recovery.

## H. The Parental Role as a Sentencing Consideration Under § 3553(a)

Under 18 U.S.C. § 3553(a), this Court must consider "the nature and history and characteristics of the defendant." These characteristics include Mr. Miller's role as a father and his particular importance to his daughter's recovery from sexual assault trauma. Courts have recognized that the loss of a parent's presence can constitute a significant collateral consequence of incarceration affecting dependent children, particularly children with acute mental health and trauma needs.

---

[1] Knipschild, R., Covers, M., & Bicanic, I. A. E. (2025). From digital harm to recovery: a multidisciplinary framework for First Aid after Online Sexual Abuse. *European Journal of Psychotraumatology*, *16*(1). https://doi.org/10.1080/20008066.2025.2465083

In *United States v. Johnson*, 529 U.S. 53, 60 (2000), the Supreme Court emphasized that sentencing should reflect proportionate accountability while considering the defendant's personal circumstances and family situation. The Court's recognition that sentencing should consider the moral and legal boundaries society seeks to reinforce includes consideration of a parent's irreplaceable role in a vulnerable child's recovery from trauma.

Furthermore, § 3553(a)(2)(D) requires consideration of "the need for the sentence to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." Mr. Miller's presence in the home, providing emotional support and logistical assistance to his traumatized daughter, constitutes recognition that rehabilitation and family coherence are interconnected aspects of sentencing considerations.

## I. Mental Health and Substance Abuse

### Mental Health

The PSR notes that Mr. Miller has never been diagnosed with a mental health concern and has never participated in mental health counseling. He denied suicidal ideation or gambling problems but expressed interest in mental health treatment based on his negative childhood experiences, substance abuse history and managing the daily stress related to his daughter's victimization and subsequent guilt from the prosecution effecting his ability to be present in the future. This interest in seeking treatment is positive and demonstrates self-awareness and openness to rehabilitation.

**Substance Abuse History**

Mr. Miller's substance abuse history is significant and spans nearly 25 years, beginning in early adolescence. He first used alcohol at age 14 or 15 (last used in 2023); marijuana at age 12 or 13 (used daily through December 2023); Percocet at age 15 or 16 (used daily through 2023); Oxycontin at age 17 (used daily through 2022); and hallucinogenic mushrooms at age 32 (used monthly through 2023). Mr. Miller started using prescription drugs after he was prescribed them legally by a physician, which jumpstarted his addiction.

Mr. Miller may have attended substance abuse treatment during his childhood years but stated he never participated in substance abuse treatment as an adult. However, he expressed a strong interest in treatment. Importantly, while on supervision of pretrial services, Mr. Miller underwent a substance abuse assessment at Royal Minds in Baltimore in May 2025. The assessment recommended biweekly group sessions to sustain recovery. Unfortunately, his first supervising agent while he was on home detention informed him that he did not have to attend due to his reported sobriety, he should focus on obtaining employment, which he successfully did. This was not communicated to undersigned counsel immediately as Mr. Miller believed he was simply following the original agent's instructions. There was obvious miscommunication here, but there was no violation of pretrial release. Still, all drug tests conducted while on pretrial services have yielded negative results, which evidences his will to remain sober and productive.

**Substance Abuse as a Mitigating Factor Under § 3553(a)**

Extensive neurological and behavioral science confirms that substance abuse fundamentally alters the brain's ability to assess risk, weigh consequences, and exercise sound judgment. Addiction is a chronic brain disorder that disrupts neural pathways governing rational decision-making, impulse control, and emotional regulation. The American Psychiatric Association's Diagnostic and Statistical Manual (DSM-5) classifies substance use disorders as mental disorders, distinguishing them from moral failures.

Courts have increasingly recognized that substance abuse mitigates culpability under § 3553(a). In *United States v. Hendrickson*, 25 F. Supp. 3d 1166 (N.D. Iowa 2014), the court concluded that a defendant's addiction warranted mitigation in sentencing because it "physically hijacks the brain" and diminishes "the addict's capacity to evaluate and control his or her behaviors." The court held that "the capacity to evaluate the consequences of one's actions is central to one's culpability."

Mr. Miller's substance abuse history, beginning at age 12, spanning 25 years, and involving multiple highly addictive substances, fundamentally compromised his capacity for rational decision-making. While his addiction does not excuse his criminal conduct, it is highly relevant to his culpability under § 3553(a)(1) and (2). A sentence that accounts for this mitigating factor, particularly when combined with his demonstrated willingness to engage in substance abuse treatment, is appropriate.

In United *States v. Walker*, 252 F. Supp. 3d 1269, 1292 (D. Utah 2017)  the court found that defendant's "life-long addiction relevant, and mitigating, to his personal culpability." Similarly, the National Institute on Drug Abuse explains, drug abuse is a

mental illness "because addiction changes the brain in fundamental ways, disturbing a person's normal hierarchy of needs and desires and substituting new priorities connected with procuring and using the drug. The resulting compulsive behaviors that override the ability to control impulses despite the consequences are similar to hallmarks of other mental illnesses." Nat'l Inst. On Drug Abuse, Is Drug Abuse a Mental Illness? available at https://www.drugabuse.gov/publications/research-reports. See also Nora D. Volkow, Preface to Nat. Institute on Drug Abuse, Drugs, Brains, and Behavior: The Science of Addiction (2010) ("As a result of scientific research, we know that addiction is a disease that affects both brain and behavior").

### J. Current Employment and Rehabilitation

Since summer 2025, Mr. Miller has been employed as a driver at Second Chance Behavioral Health Center in Glen Burnie, Maryland, earning $1,000 biweekly. This employment demonstrates his capacity to maintain lawful work and his commitment to supporting himself and his family. The position at a behavioral health center is particularly significant as it demonstrates Mr. Miller's commitment to helping others overcome the same challenges that have plagued his own life. Mr. Miller reported no other employment in the past 10 years, indicating that this position represents a positive change in trajectory and a genuine commitment to rehabilitation before sentencing. Mr. Miller's employer, Towanda Taylor, CEO of Second Chance Behavioral health, wrote that he has "demonstrated the ability to deliv[er] excellent productivity and efficacy in his duties and responsibilities. He is kind, courteous, patient with our clients and has been loyal." (*See* Exhibit 1)

### K. Purposes of Sentencing Under § 3553(a)(2) and the Need for a Variance

## 1. Promote seriousness and Just Punishment; Respect for the Law (§ 3553(a)(2)(A))

A 96-month (8-year) sentence represents a profound deprivation of liberty. Mr. Miller will lose nearly a decade of his life, years he cannot recover, years during which he will miss his children's developmental milestones, and years during which his traumatized daughter will navigate recovery without her father's daily presence and support. Eight years is a substantial punishment that reflects the seriousness of distributing cocaine in Baltimore communities and acknowledges the harm his conduct caused, while still accounting for his significant mitigation.

A sentence of 96 months also demonstrates that federal law against drug trafficking is enforced with seriousness and certainty. This sentence reflects and reinforces respect for the law without imposing a punishment greater than necessary.

## 2. Deterrence (§ 3553(a)(2)(B))

Deterrence operates on two levels: specific deterrence (deterring Mr. Miller from future criminal conduct) and general deterrence (deterring others from similar conduct). An eight-year sentence provides powerful specific deterrence to Mr. Miller. The loss of freedom, separation from family, and the collateral consequences of felony conviction constitute substantial punishment that will deter Mr. Miller from drug trafficking upon release.

General deterrence requires certainty, not harshness. In *United States v. Bannister*, 786 F. Supp. 2d 617, 668 (E.D.N.Y. 2011), the court observed that "deterrence arises from certainty, not harshness, of punishment." The conviction of Mr. Miller for federal

drug trafficking and the imposition of an eight-year federal prison sentence constitute powerful general deterrence. Empirical evidence confirms that beyond a certain threshold, extended incarceration provides diminishing returns in terms of additional deterrence or punitive value; a recent 2024 study by FWD.US[2] found that incarceration is among the least effective and most expensive means to advance safety and that extremely long sentences do not deter or prevent crime.

### 3. Protection of the Public (§ 3553(a)(2)(C))

Mr. Miller is not a violent offender. His convictions relate to drug possession and distribution, not violence, assault, or threat, and the PSR notes no information suggesting obstruction of justice. Mr. Miller's primary risk to the public is recidivism in drug possession or trafficking, not violence. A 96-month sentence provides substantial protection by incapacitating Mr. Miller during the period when he is most likely to engage in criminal conduct. His demonstrated employment at a rehabilitation facility, his negative drug screens while on pretrial services, and his strong family support structure all suggest substantially reduced recidivism risk upon release.

### 4. Rehabilitation and Treatment (§ 3553(a)(2)(D))

A sentence of 96 months allows for Mr. Miller's participation in programming and treatment while in the Bureau of Prisons. The BOP offers substance abuse treatment programs critical for Mr. Miller given his 25-year history of addiction. However, a sentence significantly longer than the lower end of the agreed range provides diminishing

---

[2] https://www.fwd.us/news/turning-the-tide-on-mass-incarceration/

returns in terms of rehabilitation and may undermine, rather than promote, successful reentry.

Mr. Miller will be 45 years old upon release from a 96-month sentence, still young enough to reintegrate into his family and community. A much longer sentence would increase the likelihood that Mr. Miller will be released as an aging man with depleted family connections and limited employment prospects. The statutory directive in 18 U.S.C. § 3582(a) provides that "imprisonment is not an appropriate means of promoting correction and rehabilitation," suggesting that sentences should not be extended beyond the point where they serve rehabilitative purposes.

Mr. Miller's commitment to treatment, his successful engagement with Royal Minds, his negative drug screens on pretrial supervision, and his employment at a behavioral health center all underscore that a moderate but substantial sentence—96 months—best aligns rehabilitation with protection of the public and the needs of his family, particularly Payton.

## VI. CHARACTER AND FAMILY SUPPORT: LETTERS FROM THOSE WHO KNOW MR. MILLER

This Court should consider the substantial support Mr. Miller has received from family members, friends, and colleagues who speak to his character and his role as a devoted father. The following individuals have provided character letters demonstrating Mr. Miller's genuine commitment to his children and his capacity for rehabilitation:

1. Shamira Washington, the mother of Mr. Miller's daughter, Amora Miller, has observed Mr. Miller's parenting firsthand over the course of their co-parent

relationship. Ms. Washington testifies that Mr. Miller takes his role as a father seriously, demonstrating care, concern, and respect for their daughter. She has personally interacted with Mr. Miller's other children and witnessed his consistent involvement, responsibility, and efforts to ensure they feel loved, included, and supported. As a co-parent, Ms. Washington has seen Mr. Miller demonstrate growth, maturity, and accountability. He communicates respectfully regarding matters involving their child and demonstrates a willingness to learn from past experiences and improve himself for the sake of his children. Ms. Washington believes Mr. Miller is a devoted father who values his role and understands the importance of being a positive influence in his children's lives. (*See* Exhibit 2)

2. Tiffany Carlton, the mother of Mr. Miller's daughter, Journie Carlton (age 16), has written to the Court emphasizing Mr. Miller's active and involved role as a father. Ms. Carlton notes that although she and Mr. Miller are not in a relationship, he has remained deeply committed to being present in their daughter's life. She attests that Mr. Miller provides emotional support, guidance, and care that is critically important to their daughter. Ms. Carlton describes Mr. Miller as a decent person who has shown care, responsibility, and commitment to being a parent. She emphasizes that her daughter is at a critical stage in her life where guidance, structure, and parental support are especially important, and that removing her father from her life at this time would be extremely difficult for her emotionally. Ms. Carlton respectfully asks the Court to consider a sentence that would allow Mr. Miller to return home and continue being present for their daughter. (*See* Exhibit 3)

3. Latonya Charles-Rooks, the grandmother of Mr. Miller's daughter Amora, has known Mr. Miller for a significant period of time and testifies that he has always been kind, respectful, and dependable. She writes that Mr. Miller takes his role as a father seriously, caring for his children every other week and providing them with the best physical, mental, and emotional support possible. Ms. Rooks describes Mr. Miller as attentive, present, and nurturing, providing encouragement and stability that his children rely upon. She has spoken with Mr. Miller in personal conversations and observed his self-awareness, accountability, and genuine desire to continue elevating himself so that he can be the best father he can be. Ms. Rooks notes that Mr. Miller has also been a dedicated and reliable worker who understands the importance of working, providing, and contributing positively to society. She believes that Mr. Miller's place is at home with his children, continuing to raise them, support them, and model growth, responsibility, and perseverance. Ms. Rooks respectfully asks the Court to consider Mr. Miller's character, his role as a father, and his responsibilities to his children. (*See* Exhibit 4).

4. Jurnie Carlton, Mr. Miller's 16-year-old daughter, has written a personal letter to the Court expressing the profound importance of her father in her life. Jurnie writes that her dad has always been present for her, supporting her emotionally, guiding her, and being there when she needed advice or encouragement. She emphasizes that knowing she can rely on her father gives her a sense of stability and comfort. Although Jurnie understands that her father has made mistakes and recognizes that actions have consequences, she also knows him as a caring and responsible parent who continues to try to do better and be there for her. She

describes him as a good dad who plays a major role in her life. Jurnie respectfully asks the Court to consider a sentence that would allow her father to come home and continue being present in her life as she continues to grow and work toward her future. (*See* Exhibit 5).

5. Kesha Cooper, a recovering drug addict who has been clean and sober for eight months, works with Mr. Miller at the rehabilitation facility where he is employed. Ms. Cooper testifies that upon meeting Mr. Miller, she felt out of place and unworthy of a normal sober life. Mr. Miller and she had a conversation, and he guaranteed her that she deserves better and told her he believed in her. Ms. Cooper writes that Mr. Miller always had a positive attitude and encouraged her to stay on the right path, and that whenever she was down, he was there for her. She credits Mr. Miller as playing a great role in her success in staying sober and states that he has changed her life as well as that of others in the program. Ms. Cooper identifies Mr. Miller as her mentor as well as her biggest supporter. (*See* Exhibit 6).

6. Laila Ali, a lifelong friend who has known Mr. Miller for over 15 years and is the mother of his godson, respectfully submits her perspective of Mr. Miller's character. Ms. Ali writes that she is clear about the seriousness of the offense before the Court and does not excuse or minimize Mr. Miller's actions. However, she has witnessed throughout the years that Mr. Miller has been a loyal, dependable, and caring presence in her family's life. As her son's godfather, he has consistently shown concern for her child's well-being, offering guidance, encouragement, and support. Ms. Ali emphasizes that one of the most important aspects of Mr. Miller's character is his role as a father. She notes that he is deeply family-oriented and has always taken his responsibilities as a parent seriously. She

notes that his love for his children and commitment to providing for them speaks volumes about his heart and character. Ms. Ali has personally witnessed meaningful change in Mr. Miller since his first encounter with federal authorities. She reports that he obtained employment at a rehabilitation facility, where he works to give back to the community and help individuals struggling with addiction and life instability. Ms. Ali believes Mr. Miller is capable of lasting change and respectfully asks the Court to consider his demonstrated efforts toward rehabilitation and the strong support system he has in place. (*See* Exhibit 7).

7. Rashad Miller, Mr. Miller's cousin, has known him his entire life and hopes the Court will consider his sincere reflection of Mr. Miller's character. Rashad writes that Mr. Miller is a deeply family-oriented individual who has always prioritized his responsibilities as a parent and a family member. He testifies that Mr. Miller is a devoted father who provides love, structure, and support for his children, and that he has personally witnessed the care and attention Mr. Miller gives to them, ensuring they are well-fed, educated, and emotionally supported. Rashad notes that Mr. Miller's children clearly adore him and feel secure and loved in his presence. Beyond his role as a father, Rashad describes Mr. Miller as kind, respectful, and honest, someone the family and community could depend on. Rashad firmly believes that Mr. Miller is capable of making positive contributions to society and that with the opportunity, he will continue to grow, support his children, and be a valuable member of the community. (*See* Exhibit 8).

8. Christina Matarazzo, the mother of Mr. Miller's daughter, Marlee Miller (age 3), has written a letter describing Mr. Miller as a devoted and loving presence in Marlee's life. Ms. Matarazzo writes that no matter what challenges Mr. Miller has

faced, he has never allowed them to interfere with his role as her father. He has been consistent, patient, and deeply committed to making sure Marlee feels loved, supported, and valued. She notes that Marlee lights up when she sees her father and that the bond they share is something that cannot be replaced or replicated. Ms. Matarazzo describes Mr. Miller as the kind of father who shows up—not just physically, but emotionally. He listens to her, guides her, and encourages her. He has been present for school events, birthdays, holidays, and the everyday moments that matter most to a child. What stands out most about Mr. Miller, according to Ms. Matarazzo, is his heart. He is gentle, thoughtful, and protective. He has a way of making Marlee feel safe and understood. Ms. Matarazzo has watched him teach her daughter patience, kindness, and resilience. She has seen him comfort Marlee when she was upset, celebrate her accomplishments, and encourage her dreams. Ms. Matarazzo emphasizes that while she is not writing to overlook or minimize the seriousness of Mr. Miller's situation, she is writing because she believes the Court should know that Mr. Miller is more than the mistakes he has made. He is a father who loves his daughter deeply, a man who has tried to be a positive force in her life, and someone whose presence has shaped her into the bright, loving child she is today. (*See* Exhibit 9).

9. Danielle Baldwin, Program Director at Ascending Counseling Solutions and a close family friend of ten years, respectfully submits her letter in support of Mr. Miller. Ms. Baldwin has had the opportunity to observe Mr. Miller not only as an individual but also as a son and a father and an important member of his family. She writes that he has always shown deep care and concern for his loved ones and takes his family responsibilities seriously. His presence and support play a

meaningful role in the stability and well-being of those who depend on him. Ms. Baldwin understands the seriousness of the matter before the Court and does not seek to excuse Mr. Miller's actions. However, she has seen firsthand the genuine remorse he feels and the emotional impact this situation has had on him and his family. She believes that a sentence which allows Mr. Miller the opportunity to remain involved in his family's life while addressing accountability and rehabilitation would have a positive and lasting impact not only on Mr. Miller but also on those who depend on him. Ms. Baldwin believes Mr. Miller is capable of learning from this experience and moving forward in a responsible, law-abiding manner. (*See* Exhibit 10).

10. Danielle McCory writes to the Court with great sincerity in support of Mr. Miller. Ms. McCory is the godmother of Mr. Miller's goddaughter, Aylin Spence, and testifies that Mr. Miller's presence in Aylin's life has been nothing short of a blessing. She notes that Aylin's father has been in federal custody for twelve years, meaning she has grown up with a void that no child should have to navigate. Mr. Miller stepped into that space without hesitation, not for recognition or praise, but because he genuinely cares. Ms. McCory writes that Mr. Miller is the person who shows up, the person who listens, and the person who makes sure Aylin feels seen, supported, and protected. There were days when Aylin struggled with the weight of her father's absence, and Mr. Miller was the one who sat with her, talked with her, encouraged her, and reminded her that she was not alone. He has attended her school events, celebrated her milestones, and been a steady male figure in her life when she needed one most. Ms. McCory emphasizes that what stands out most about Mr. Miller is his heart. He is gentle, patient, and deeply

loyal. Even while facing his own challenges, he has continued to put others first. Ms. McCory respectfully asks the Court to consider the full picture of who Mr. Miller is and notes that he is not defined solely by this moment. (*See* Exhibit 11).

11. Shavanna Williams, the mother of Mr. Miller's daughter Payton Miller (the 16-year-old sexual assault survivor), has written to the Court with respect for the difficult decisions the Court must make. Ms. Williams writes that Mr. Miller is a good man and an amazing father who is actively involved in parenting and consistently shows love, responsibility, and commitment to all his children. Her daughter Payton looks up to him and benefits greatly from his guidance, emotional support, and presence. Ms. Williams testifies that Mr. Miller has been there for them every step of the way. Following Payton's sexual assault on January 3, 2024, Ms. Williams writes that this was an extremely emotional and traumatizing time for the whole family. Mr. Miller has shown strength and compassion to help their daughter navigate through this difficult time, which she believes demonstrates his character as a person and a father. Ms. Williams writes that while she understands that mistakes may have been made, she truly believes that this situation does not define who Mr. Miller is as a person or as a father. He has shown accountability and a push to do better, and he genuinely wants to continue being a positive role model for their child and a contributing member of society. Ms. Williams respectfully asks the Court to consider the impact of a harsh sentence on Payton and Mr. Miller's other children who rely on him emotionally and financially. (*See* Exhibit 12).

## VII. CONCLUSION

Mr. Miller's conduct was serious; however, punishment must be proportionate. An eight-year federal sentence is substantial and achieves the purposes of sentencing under 18 U.S.C. § 3553(a). It provides just punishment, effective deterrence, rehabilitation opportunity, and public protection without crossing into excess. Both the advisory guideline range and excessive sentences beyond 96 months would fail to account adequately for the mitigating circumstances present in this case.

Mr. Miller's history, his childhood exposure to trauma and violence, his long-standing substance abuse and demonstrated willingness to engage in treatment, his role as a father to vulnerable children, his demonstrated employment and commitment to helping others in rehabilitation, and particularly his irreplaceable importance to his traumatized daughter's recovery, all weigh toward a sentence at the lower end of the agreed range.

A 96-month sentence is consistent with the Federal Sentencing Reform Act's mandate that sentences be "sufficient, but not greater than necessary." It accounts for the seriousness of his offense while recognizing his genuine potential for rehabilitation and successful reintegration into his family and community.

Respectfully, Mr. Miller requests that the Court impose a sentence of 96 months imprisonment, followed by a term of supervised release as required by statute. Mr. Miller further requests that the Court impose no fine given his financial circumstances and negligible monthly income, and that this sentence reflect the Court's careful consideration of all statutory factors under 18 U.S.C. § 3553(a).

Respectfully submitted,

**Jeremy M. Eldridge, Esq., #29838**
Counsel for Marvin Miller
Eldridge Crandell
1 South St, Ste 2150
Baltimore, Maryland 21202
(443) 559-4384

**Date: January 27, 2026**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 27th day of January, 2026, a copy of the foregoing Sentencing Memorandum was electronically filed using the CM/ECF filing system, and all interested parties were served.

**Jeremy M. Eldridge, Esq.**